615 So.2d 600 (1993)
Jerry Wayne METTETAL
v.
STATE of Mississippi.
No. 90-KA-0749.
Supreme Court of Mississippi.
March 18, 1993.
James D. Franks, Jr., Paul R. Scott, Smith Phillips Mitchell & Wilroy, Hernando, for appellant.
Michael C. Moore, Atty. Gen., Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PRATHER, P.J., and PITTMAN and SMITH, JJ.
PITTMAN, Justice, for the Court:
The Grand Jury of the Second Judicial District of Panola County on January 17, 1989, indicted Jerry Wayne Mettetal for the capital murder of his grandmother, Georgia Edwards, on September 17, 1988. The underlying offense charged was robbery. Upon change of venue to Tate County, the case was tried on April 9, 1990.
*601 The jury returned a guilty verdict on April 12, and subsequently was unable to unanimously agree as to punishment. The circuit court judge subsequently sentenced Mettetal to a term of life imprisonment without possibility of parole pursuant to Miss. Code Ann. § 99-19-81 (Supp. 1992). Feeling aggrieved by the jury's guilty verdict, Mettetal appealed assigning several errors. Finding no reversible error, this Court affirms the lower court conviction and sentence.

I.
Jerry Wayne Mettetal, after arguing with his grandmother over money one afternoon, returned to her house that evening where he robbed, strangled and ultimately burned her to death by setting her bed on fire.
Eddie Brewer, Georgia Mae Edwards's aunt and Mettetal's second cousin, saw the car Mettetal had been driving parked across the road from Edwards's house late Friday or early Saturday, September 16 or 17. Later that morning, about 2:00 a.m., Mettetal called him and he went to Edwards's house. The fire was out when he arrived, but they found Edwards's body after he arrived. Mettetal's car was no longer there.
Robert Anderson, Sr., Edwards's nephew, passed her house about 12:00 or 12:15 a.m. Saturday morning and saw Mettetal's car parked across the road. He noticed the lamp was on in Edwards's house and the screen door was open.
Randy Woodard lived next door to Edwards. He learned of the fire when his volunteer fireman's radio went off. The first person Woodard saw was Jimmy Mettetal, the victim's son. He told Woodard that Edwards was still in the house. Woodard put on his fire gear and tried to reach Edwards, but said it was too hot. He said the bedroom was the hottest area.
Batesville Fire Chief Barry Flint said they found Edwards's body in the bedroom where the fire started and the fire was so hot it vented itself through the roof. He said it looked like the body was in the bed.
Panola County Deputy Sheriff Charles Means, an expert in the field of arson investigation, testified there was no evidence of an accidental fire. He said the fire started on or around the bed. Means found two spots in the bedroom which indicated some presence of an accelerator, such as gasoline or kerosene, but he did not believe an accelerator was used to start the fire. He did believe someone deliberately set the fire.
John Laton works for INS Investigations Bureau investigating fires. He went to Edwards's house on September 21, and determined that the fire started in the bedroom area of the house. He believed the fire was intentionally set.
Dennis Akin, an expert in forensic chemistry, testified that he found the presence of kerosene in one of the two samples taken from Edwards's house. He said he could not determine when the kerosene was spilled.
John Kilpatrick lived on Coon Road and knew Jerry Mettetal from the class he teaches at South Panola High School. He said about 2:00 a.m. on September 17 Mettetal knocked at his door, claiming that someone had run his car off the road, and asked to use the phone. Kilpatrick waited with Mettetal about an hour until Nancy Allred came and picked him up. Mettetal returned soon, and said Allred's Mustang was too small. Kilpatrick pulled Mettetal's car out of the ditch and towed it to a house in Courtland. He said they didn't go past Edwards's house on the way to Courtland. When he brought Mettetal and Allred back to pick up her car, they passed Edwards's house, which had burned by that time, almost 4:00 a.m. When Kilpatrick dropped the couple off, they headed back toward Edwards's house in the Mustang. He said while he and Mettetal were waiting for Allred a fire truck passed them headed west.
Nancy Allred, 18, lived in Courtland and had known Mettetal four or five years. She said Mettetal called about 3:00 a.m. on September 17 asking her to meet him on Coon Road. After she tried to pull his car out of the ditch, Kilpatrick did so and *602 towed it to the apartment in Courtland. Kilpatrick then brought them back to pick up Allred's car. On the way back they passed Edwards's house, which was on fire. Allred said Mettetal was scared because he said "they" would blame him for setting the fire.
Steven Timothy Hayne, an expert in forensic pathology, testified that the victim was sixty to seventy years old and had cancer in the past. His examination indicated the victim was alive at the time of the fire. He said death was caused in part by the fire, and supportive evidence indicated some act of smothering or strangulation. He said she appeared to have been strangled, but it was incomplete. He said Edwards died shortly after the fire was set.
Highway Patrol Criminal Investigator Roy Wooten interviewed the defendant at the Lafayette County Sheriff's Department in Oxford. He established that Mettetal was not under the influence of alcohol, medication, or tremendous pain. He advised Mettetal of his rights and had him sign a waiver of those rights. Mettetal gave a free and voluntary statement in which he confessed to the crime.
Theresa Alexander, Edwards's neighbor, testified that she saw Mettetal and Edwards arguing about money the afternoon before the fire. She said Mettetal threatened Edwards, then got in his car and spun out.
The above witnesses were all for the prosecution. The defense presented no witnesses. On appeal, Mettetal raises several issues:
I. The trial court erred in refusing to allow defendant to conduct individual voir dire of prospective jurors who had previously admitted having knowledge of the case, regarding what that specific knowledge was.
II. The trial court erred in denying appellant's motion in limine to prohibit the state and the court from disclosing to the venire panel that the jury could only sentence the appellant to death if it first found him guilty of capital murder, and could not so sentence if they found him guilty of murder or manslaughter.
III. The trial court erred in denying appellant's motion to prohibit the excusing of potential jurors over the age of sixty-five.
IV. The trial court erred in denying appellant's motion to prohibit the excusing of potential jurors unable to read or write.
V. The trial court erred in failing to grant appellant's motion for additional attorneys' fees.
VI. The trial court erred in overruling appellant's motion to exclude certain physical evidence seized from appellant's automobile.
VII. The state failed to establish corpus delecti prior to introduction of appellant's statement and, therefore, the trial court erred in allowing appellant's statement into evidence, in denying appellant's motion for directed verdict and in refusing appellant's requested peremptory instruction D-1.
VIII. The trial court erred in denying appellant's requested manslaughter instruction.
IX. The trial court erred in overruling appellant's motions to suppress statement of October 21, 1988.
X. The trial court erred in giving instruction S-2 and in refusing to give instruction D-4, thereby failing to properly instruct the jury as to the essential elements of the underlying charge of robbery.
This Court will only address those issues that warrant discussion.

II.
Mettetal contends that the trial court erred in refusing to allow him to conduct individual voir dire of prospective jurors who had previously admitted having knowledge of the case. Defense counsel requested individual voir dire of four panelists, Nos. 55, 58, 80 and 85, on the basis that *603 they all stated they had heard of the case and were potentially biased. Defense counsel requested to be allowed to do the voir dire, but the trial judge said that he would conduct it. Panelists No. 55 and No. 80 were excused, and panelist No. 85 was not reached for the jury. Thus, there is no need to discuss any potential prejudice with respect to those three panelists.
Panelist No. 58 said he had just asked someone what Mettetal was accused of. He stated that he could follow jury instructions and would not be swayed in any way, because he did not know much about it. He stated he did not know the young man and had nothing against him.
Mettetal asserts on appeal that he was denied a fair trial because he was forced to use his last peremptory challenge to remove No. 58 from the jury. The loss of a peremptory challenge, however, does not constitute a violation of the constitutional right to an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean that the defendant was denied his constitutional rights. Ross v. Oklahoma, 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80, 90 (1988).
This Court has explained that a prerequisite to presentation of a claim of a denial of constitutional rights due to denial of a challenge for cause is a showing that the defendant had exhausted all of his peremptory challenges and that the incompetent juror was forced by the trial court's erroneous ruling to sit on the jury. Chisolm v. State, 529 So.2d 635, 639 (Miss. 1988). Mettetal cannot make such a showing in the case at bar because he did in fact strike No. 58 peremptorily. The venireman in question did not in fact sit on the jury.
Mettetal v. State, 602 So.2d 864, 869 (Miss. 1992).
Mettetal does not argue, much less make a showing, that an incompetent juror was forced to sit on the jury.
This assignment of error is without merit.

III.
Mettetal also contends that the trial court erred in overruling his motion to exclude certain physical evidence seized from his automobile.
Panola County Sheriff David Bryan was told of Edwards's death about 2:30 a.m. September 17. He went to the home and identified the tire tracks found across the road from the victim's house. He found Mettetal at a Courtland apartment with Nancy Allred the next morning. He also found the car which matched the tire tracks. Later that day he had the car towed to Meek Auto in Batesville. He ran a trace on the car, found it was registered to Amy Jo Mettetal, and received permission from her to search the car. He recovered a paper sack of money, about $100, underneath the floorboard, and a peanut can full of silver.
Amy Jo Mettetal (Griffin) was married to the defendant and living in Batesville in September 1988. She said she owned the car and gave permission to the police to search. She gave a set of keys to the sheriff. Although her husband had possession of the car from May 3 through September 17, she never indicated that the car had been in his sole possession.
In Brown v. State, 358 So.2d 1004, 1005 (Miss. 1978), this Court said:
Consent to search voluntarily given without coercion may be given by a third party who possessed common authority, mutual use and joint control over property not in the exclusive control or possession of the defendant and where the defendant had no reasonable expectation of privacy.
See also United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); Houston v. State, 531 So.2d 598, 602 (Miss. 1988); Shaw v. State, 476 So.2d 22, 24 (Miss. 1985); Haralson v. State, 318 So.2d 891 (Miss. 1975).
Although Amy may not have had mutual use of the car, this was not apparent when she gave the police permission to search the car. Amy did have common authority over the car and even joint control as title *604 holder. She told the police that she owned the car, provided keys to them and had apparent authority to authorize the search.
In Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), Chicago police were summoned by a woman who had been beaten. She led them to an apartment in which the accused was presumably asleep, and opened the door with her key. She referred to the apartment as "our" apartment, and said she had clothes and furniture there. Upon entering with her permission, police found drugs and drug paraphernalia. The accused, charged with a drug offense, moved to suppress the evidence because the woman had vacated the apartment several weeks earlier and had no authority to consent. The United States Supreme Court noted the following standard:
[D]etermination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises?
Illinois v. Rodriguez, 497 U.S. at 188, 110 S.Ct. at 2801, 111 L.Ed.2d at 161. See also Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968). The Court held that the apparent authority of the woman was sufficient consent.
The police were reasonable in their belief that Amy Mettetal had common authority, joint control, and even mutual use over the car. She was the title holder, told them she owned the car and provided keys to enter. Thus, the consent to search was valid, and the resulting evidence was admissible.

IV.
After a review of the record and briefs in this case, we find that the remaining issues raised by Mettetal are without merit and do not warrant discussion. We affirm Mettetal's conviction and sentence.
CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT AS AN HABITUAL OFFENDER IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SAID SENTENCE SHALL RUN CONSECUTIVELY TO THE SENTENCE IN CAUSE NO. 6340 IMPOSED BY THE UNION COUNTY CIRCUIT COURT.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, BANKS, ROBERTS and SMITH, JJ., concur.
McRAE, J., concurs in results only.